## PEOPLE v KIMBLE (AFTER REMAND)

OPINION OF THE COURT

1. WITNESSES—CRIMINAL LAW—RES GESTAE WITNESSES—PROSECUTORS
—DUTY TO PRODUCE—DILIGENCE—CUMULATIVE TESTIMONY.

Failure by a prosecutor to produce at trial an indorsed res gestae
witness who apparently had moved to another state is reversi-
ble error where the prosecution failed to follow the statutory
procedure for securing an out-of-state witness's attendance at
trial, failed to obtain a subpoena for the witness for an eviden-
tiary hearing held upon remand, failed to obtain the witness's
married name or the name of her husband's employer, and
failed to present evidence that the witness's testimony would be
merely cumulative.

DISSENT BY M. J. KELLY, J.

2. WITNESSES—CRIMINAL LAW—RES GESTAE WITNESSES—PROSECUTORS
—DUTY TO PRODUCE—CUMULATIVE TESTIMONY.

*The production of a res gestae witness was excusable where her
testimony would have been cumulative in a trial for uttering
and publishing a forged instrument where the missing witness
was merely a conduit, the teller to whom the defendant pre-
sented the check; there was ample testimony at the trial that
the defendant was present at the time and place the checks
were stolen, came into the bank and presented the check to one
of the tellers; other bank employees testified to the main part
of the transaction; the jury had the defendant's confession to
weigh against his belated and unsupported alibi defense; and
defendant was clearly and unequivocally identified as the per-
son who presented the check.*

3. CRIMINAL LAW—UTTERING AND PUBLISHING—ELEMENT OF CRIME—
PRESENTMENT OF INSTRUMENT—CORPUS DELICTI.

*Testimony, in a trial for uttering and publishing a forged instru-
ment, that a defendant came into a bank and presented a check
which was forged to one of the tellers for payment establishes*

REFERENCE FOR POINTS IN HEADNOTES
[1–3] 29 Am Jur 2d, Evidence §§ 708, 713.

*the corpus delicti; the money need not have been paid to the defendant.*

Appeal from Kent, John H. Vander Wal, J. Submitted March 5, 1975, at Grand Rapids. (Docket No. 20286.) Decided September 23, 1975.

Walter R. Kimble, Jr. was convicted of uttering and publishing a forged instrument. Defendant appealed. Remanded for further proceedings, jurisdiction retained, 60 Mich App 690 (1975). After remand, reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Harold S. Sawyer,* Prosecuting Attorney, *Donald A. Johnston III,* Chief Assistant Prosecuting Attorney, and *Craig S. Neckers,* Assistant Prosecuting Attorney, for the people.

*Murphy, Neff, Burns & McInerney,* for defendant.

Before: D. E. HOLBROOK, P. J., and BRONSON and M. J. KELLY, JJ.

### AFTER REMAND

D. E. HOLBROOK, P. J. Our previous opinion in this case is found at 60 Mich App 690; 233 NW2d 26 (1975). Therein we remanded in accord with GCR 1963, 820.1(5) for a hearing in accord with *People v Robinson,* 390 Mich 629; 213 NW2d 106 (1973). We said therein at 60 Mich App 698; 233 NW2d at 30:

"It shall be the obligation of the trial judge to require the prosecutor to produce or explain why he cannot produce Edrita Roth at such hearing, and why she was

not produced at trial. If [Miss] Roth is produced she shall be examined regarding her knowledge of the crime of which defendant was convicted."

The remand hearing was held May 28, 1975, and several witnesses testified. Jack Billingsley, a Grand Rapids police officer, testified as follows concerning the failure to produce Edrita Roth, an indorsed res gestae witness, at the trial:

"*Q [defense attorney]:* To answer my question though, prior to January 7, if that is the date, January 7, 1974, two days before trial, prior to January 7 you had made no attempt to serve the subpoenas?

"*A.* Not that I recall.

"*Q.* Specifically with respect to Edrita Roth you had made no effort to serve the subpoena?

"*A.* Not that I recall.

"*Q.* When you went out to the bank on January 7, 1974, someone told you that Edrita no longer worked there?

"*A.* Yes.

"*Q.* You don't recall who informed you of that?

"*A.* I don't remember specifically who that was.

"*Q.* To the best of your recollection someone simply said she lived in Seattle?

"*A.* Whether it was a manager or another teller, I don't remember.

"*Q.* Did you talk to her employer to find out her home address?

"*A.* I talked—going back to my standard procedure, if I find someone out of town—

"*Q.* Well, Officer, in all due respect, I want you to try to recall your memory of this case.

"*A.* To say specifically if I remember talking to them at this point in time, I do not.

"*Q.* You have no recollection then of attempting to serve the subpoena on Edrita Roth at any home address in the Grand Rapids area?

"*A.* I don't recall having a home address on them, sir.

*"Q.* Well, do you recall what you did to try to obtain a home address on them?

*"A.* As I recall, I went to the bank and received the information from that point. I don't recall if I had any other information or not.

*"Q.* Would it be fair to say then, Officer, that you went to the bank approximately two days prior to the scheduled trial to serve the subpoena on Edrita Roth?

*"A.* Yes.

*"Q.* Would it further be true that someone at the bank, the person whom you are not sure whether it was a manager or coemployee, informed you that she lived in Seattle, Washington?

*"A.* Yes.

*"Q.* Is it further true that after that you did nothing to attempt to serve the subpoena other than to advise the prosecutor's office of the situation?

*"A.* As I recall, yes.

*"Q.* You did nothing to contact any of her family?

*"A.* I don't recall that, no.

*"Q.* You did nothing to try to locate the home address for Edrita Roth in the Grand Rapids area?

*"A.* I may have, but I don't recall doing so.

*"Q.* Do you recall talking with anyone other than one person who said to you that she now lived in Seattle, Washington?

*"A.* As I recall there were two other people subpoenaed. Whether I discussed with each of those or both of those, at this point in time, I don't remember.

*"Q.* Were you given any directions by the prosecutor's office as to further efforts that you should undertake to serve Edrita Roth?

*"A.* None that I remember.

*"Q.* Do you recall making any telephone conversations or telephone calls to anyone to try to locate Edrita Roth?

*"A.* None that I can recall.

*"Q.* Officer, are you familiar as a server of subpoenas that the statute which authorizes one to secure the attendance of a witness who resides in the sister state? *[sic.]*

"*A.* No, I am not.

"*Q.* You made no efforts then I take it to request from the trial court a certificate or a subpoena for purposes of service of this subpoena on Edrita Roth in the state of Washington?

"*A.* On no cases do I handle any mail or subpoenas to persons outside of the city. It is done by the prosecutor or the city attorney or whoever handles the subpoenas originally.

"*Q.* In this particular case then, to answer my question, you did not apply to the court for the issuance of the subpoena for out of the state service?

"*A.* No, I did not.

"*Q.* To your knowledge did any one else in this particular case?

"*A.* Not to my knowledge."

It is obvious that the prosecution failed to follow the statutory procedure for securing the out-of-state witness's attendance at the trial, and further, that the people failed to exercise the degree of due diligence required. *People v Harrison,* 44 Mich App 578; 205 NW2d 900 (1973), *People v Nieto,* 33 Mich App 535; 190 NW2d 579 (1971).

The trial judge also ruled on the remand to the circuit court that the testimony of Edrita Roth, the res gestae witness, would be merely cumulative. There was no additional testimony taken at the remand hearing of witnesses who observed the occurrence concerning the alleged crime. In our previous opinion we determined that there was no evidence presented at trial that Edrita Roth's testimony would be merely cumulative.

We also note that the Assistant Prosecuting Attorney, Craig S. Neckers, testified as follows at the remand hearing concerning efforts to obtain Edrita Roth's presence at the remand hearing:

"*Q [by Mr. Johnston, assistant prosecuting attorney.*

Mr. Neckers, would you state your full name for the record, please.

"*A.* Craig S. Neckers.

"*Q.* How are you employed?

"*A.* I am an assistant prosecuting attorney for the County of Kent.

"*Q.* For how long have you been an assistant prosecuting attorney for Kent County?

"*A.* A little short of a year.

"*Q.* In that capacity, have you had occasion to work extensively on the appellate case load of the prosecutor's office?

"*A.* Yes, I have.

"*Q.* And among the cases handled by you, was there included the matter here before the court the case of the People against Walter R. Kimble?

"*A.* That is correct.

"*Q.* Did you brief and argue this case in the Court of Appeals?

"*A.* I briefed it. I believe we submitted it on briefs and did not orally argue it.

"*Q.* Subsequent to the rendition of the opinion of the Court of Appeals on April 25, 1975, did you take steps towards preparing for the remand hearing we are holding at this particular time?

"*A.* Yes, I did. On the second of May of 1975, after discussing with Mr. Murphy how we were going to go about the logistics of this particular matter, I called the personnel office of the Central Bank here in town and I spoke to a man in the personnel office by the name of Mr. Beal, I believe, and I questioned him as to a last known address in the city of Grand Rapids for Edrita Roth.

"He checked his files in the personnel office of the Central Bank and informed me that he had no such address in the city of Grand Rapids; that he had no last known address for Edrita Roth period.

"He further informed me, however, that he did have the name, address and telephone number of Miss Roth's parents, and he gave that to me as Mr. & Mrs. Arthur Roth, 555 Plumb Street in Wyandotte, Michigan, and gave me the telephone number.

"*Q.* Did you make an effort to reach Edrita Roth through the last known address of her parents pursuant to the information you obtained from Mr. Beal?

"*A.* Yes, I did. On several occasions on the second of May, precisely according to the—to some notes that I made, six telephone calls on that date, in the morning, through the afternoon, I telephoned the parents' number in Wyandotte, Michigan, and was successful late in the afternoon in speaking with Mrs. Arthur Roth, Edrita's mother.

"She informed me that her daughter indeed was married, and that she travels with her husband wherever he goes and she told me that he travels from Pittsburgh, Pennsylvania to Waterloo, Iowa.

"She further informed me that Edrita calls home ever *[sic]* week and Mrs. Roth assured me she would let me know where I could reach her or have Edrita call me as soon as possible.

"I gave her my telephone number in the prosecutor's office.

"*Q.* Now, having obtained that information, what did you do next in your efforts to locate Edrita Roth?

"*A.* That telephone conversation transpired on the second of May. I heard nothing from Edrita or her mother for several days, and on the eighth, on two different occasions I attempted to reach the telephone number in Wyandotte and received no answer. On the 12th again and on the 13th also I telephoned the number in Wyandotte and received no answer. On the 20th of May, however, I called at approximately 11:00 o'clock in the morning, the parents' telephone number in Wyandotte and spoke once again with Edrita's mother, Mrs. Arthur Roth. She indicated that she had indeed spoken with Edrita Roth on some prior occasion and she informed me that Edrita had tried to call me at the number that I had given her in the prosecutor's office and had had some difficulty. It ended up with her speaking to someone in the police department. She had tried to get my number at home and had been unable to do so.

"She further informed me that upon talking with Edrita about this case, and about the information I had

given her, that Edrita was without knowledge or couldn't remember anything what had transpired on the third of July, 1973, at the Central Bank that we talked about.

"*Mr. Murphy [defense attorney]*: Objection, its hearsay.

"*Mr. Johnston:* I think most of this is. What I am trying to get at the nature of our efforts to find the witness and what happened here. I am not really attempting to prove anything the witness knows.

"Having obtained this information on May 20, did you have any further contact in your efforts to locate Edrita Roth?

"*A.* Well, Mrs. Roth informed me that Edrita was to come home over the Memorial Day weekend, and that she anticipated her arrival in Wyandotte on Saturday, I believe the 24th of May. I gave her my telephone number here in the Hall of Justice at the Prosecutor's Office and also gave her my home phone number in Grandville. I asked that she please call me when she arrived either Saturday night or Sunday morning, and I asked specifically that she call me at 9:00 a.m. on Sunday morning.

"On May 25, 1975, which was last Sunday, at approximately 9:15 a.m. I received a call at my home from Mrs. Arthur Roth indicating that her daughter had not come home, that she did not know where she was; that she had absolutely no contact with her in the prior five days; that being from the 20th of May to the 25th, and she did not know where she was. I also should indicate that I wrote a letter on the 20th of May to Edrita Roth, in care of her parents, and sent it to the address that I had for her parents, indicating a little bit of what this matter entailed and asking her to please contact me.

"I have heard nothing from Edrita Roth and never had any direct contact with Edrita Roth.

"*Q.* Did the letter that you wrote come back to you at all?

"*A.* No, I never received the letter. The letter was received as far as I know.

"*Q.* In other words, it wasn't returned undelivered to the prosecutor's office?

"*A.* No, it wasn't.

"*Q.* And this is the extent to this particular moment of your contact with the Roth family and the attempt to locate Edrita Roth?

"*A.* That is correct.

"*Mr. Johnston:* I have no further questions of the witness.

CROSS EXAMINATION BY MR. MURPHY:

"*Q.* Mr. Neckers, did you do anything other than make telephone calls and send one letter in attempting to locate Edrita Roth?

"*A.* No, I did not.

"*Q.* When you were informed that Edrita Roth was to go to her parents home in Wyandotte, Michigan, for the weekend of May 24, 1975, did you take any steps to procure a subpoena to have served at that address on Edrita Roth for the purposes of this hearing today?

"*A.* No, I did not.

"*Q.* Have you utilized the forces of the police agencies in attempting to locate Edrita Roth?

"*A.* Not at all.

"*Q.* Now, with respect to your telephone conversation with Mr. Beal, where he indicated the name of Edrita's parents, their address and telephone number, would it be fair to conclude that that same information was available on January 7, 1974?

"*A.* I would assume it would be, but I certainly have no direct knowledge of that.

"*Q.* But he did get this information from her employment file?

"*A.* I believe so.

"*Q.* And if I understand correctly you learned in your conversations with Edrita's mother that she calls home every weekend?

"*A.* She informed me that she had a regular habit of calling her at least once a week.

"*Q.* Did you ask her mother what her address was?

"*A.* I asked her mother if there was anywhere that Edrita could be reached. She told me that she is on the road 24 hours a day, seven days a week and there is

absolutely no fixed address where Edrita Roth can be reached.

"*Q.* Did you ask her where she reaches her daughter in case of an emergency?

"*A.* She told me that her daughter calls her. She does not call her daughter.

"*Q.* She advised you · that she did not know of an address for her daughter?

"*A.* That is correct.

"*Q.* This was after you told her who you were and what your purpose was?

"*A.* That is correct. She was informed, Mrs. Roth was informed when I spoke with her, all three times that I spoke with her, who I was and why I wanted to speak with her daughter or at least get in contact with her daughter."

It is also obvious that the Assistant Prosecuting Attorney did not see fit to obtain a subpoena for Edrita Roth's appearance in court, nor did he find out her married name, nor her husband's employer, which would have possibly greatly aided in obtaining the res gestae witness's appearance at the remand hearing.

Reversed and remanded for a new trial.

BRONSON, J., concurred.

M. J. KELLY, J. *(dissenting).* The question of due diligence aside, I now believe that the trial judge was correct in excusing the production of the missing res gestae witness on the ground that her testimony would be cumulative. This forces me to reverse myself on our previous holding that "there was no evidence that Mrs. Roth's *[sic]* testimony would be merely cumulative". In our remand opinion we posited that defendant and the teller might have had a conversation. It is totally inconceivable to me how any conversation the defendant could

have had with Miss Roth could be exculpatory.
The main part of the transaction was between the
bank manager, Mr. Gully, and the defendant. Mr.
Gully had an extensive conversation with the
defendant. Both Mr. Gully and the defendant testi-
fied. The details of the transaction are clearly and
unequivocally supported by the teller in the stall
adjoining Miss Roth's. I was hasty in signing the
remand order and I should not have done so.

There is absolutely no reasonable quarrel with
the positive identification of the defendant at the
time and place of the theft of the checks. There
also was positive identification of the defendant at
the bank. The missing witness was merely a con-
duit—the teller to whom defendant presented the
check. Having been previously alerted, the teller's
supervisor and the bank manager obtained the
defendant's driver's license and the license plate
number on the car he entered when he left the
bank. There was ample testimony at the trial that
the defendant came into the bank and presented
the check to one of the tellers for payment. This
establishes the corpus delicti. The money need not
have been paid. *People v Brigham,* 2 Mich 550
(1853).

Furthermore, the jury had the defendant's own
confession to weigh against his belated and unsup-
ported alibi defense. After a *Walker* hearing, the
court admitted the defendant's statement given to
interrogating police officers, which I quote in part:

"*Q.* What else did he say to you about that check?
"*A.* Well he said that he went into the bank with the
check but that he did not get any money from it. He
also named another person that was with him present
at the time that he went into the bank.
"*Q.* Well it is alright to tell us what he said.
"*A.* Well you've got to understand when we first

started talking to him, after he signed that card it took us a little while to get down to what we really wanted to talk about because he kept beating around the bush. I finally told him that if he agreed to talk if he couldn't tell the truth I didn't want to talk to him at all and I got up to leave. I was going to take him back. I told him that we already had his prints on the check, he didn't have to tell us anything if he didn't want to. I got ready to leave then he said well, just a minute I'll talk to you I will tell you the truth. This is when he told me that he did try to cash the check, that he didn't get the money from the check. And I asked him who was with you and he told me that Smith, a guy named Smith was with him and a man by the name of Yarbrough was driving the car. He said that when he left Smith was the one that was supposed to have been in there after change. When he left that Smith laid down in the seat of the car and this is why the man only saw two people in the car when he saw the car."

I am compelled to agree with the trial court that the teller's production was excusable because her testimony would be cumulative. Sandra Lynn Ham, a teller at the bank, clearly and unequivocally identified the defendant. She was stationed in the stall next to the one manned by the missing res gestae witness. After identifying the defendant she was asked:

"*Q.* How far were you away from these things going on?
"*A.* Two feet maybe I was pretty well—I saw who the check was made out to and the driver's license matched the check."

Shelton Gully, the branch manager of the bank, not only identified the defendant but testified as to the conversation he had with the defendant and then followed the defendant out of the bank, drove his own automobile into direct confrontation with

the defendant's automobile: " * * * our cars were face to face", and wrote down the make, model and license number of the vehicle.

The people had an extremely strong case. Under the circumstances I am compelled to agree with the trial court that the production of the teller was excusable because her testimony would be cumulative. The defendant's last minute alibi defense was flimsy on his own testimony, completely unsupported by any corroborating witness whatsoever. The notice of alibi had contained the names of supporting witnesses but they were not called and did not testify. The excuse given was that they had the dates confused.

I would affirm on the basis of the second exception to the res gestae witness rule: that the production of the witness was excusable because her testimony would have been cumulative. *People v Koehler,* 54 Mich App 624; 221 NW2d 398 (1974).